**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RICHARD USHER
17 Doves Croft
Tunstall
SITTINGBOURNE
ME9 8LQ
United Kingdom

     Plaintiff,

       v.

THE UNITED STATES DEPARTMENT
OF JUSTICE
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

THE UNITED STATES ATTORNEY
GENERAL
The United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

THE ASSISTANT ATTORNEY GENERAL
FOR THE ANTITRUST DIVISION OF THE
UNITED STATES DEPARTMENT OF JUSTICE
The United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

SARAH OLDFIELD
The United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

     Defendants.

Civil Action
No. 1:21-cv-00654

---

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### PRELIMINARY STATEMENT

1.     This Complaint raises profound questions concerning a defendant's right to access

exculpatory materials in an administrative enforcement action.  The Department of Justice

("DOJ") has adopted a purposeful and spiteful strategy to prevent a defendant from using the exculpatory materials that led to his acquittal in his criminal trial to defend himself from the same allegations in a follow-on administrative enforcement action.  Plaintiff Richard Usher seeks relief in this Court because the United States Government is playing a shell game with evidence—evidence that the Government has already admitted in the parallel criminal case is exculpatory—that Usher needs for his defense in the parallel Office of Comptroller of the Currency ("OCC") administrative enforcement action that carries severe penalties, including lifetime banishment from his livelihood.  Since Usher's 2018 acquittal by a New York jury, the OCC and DOJ have worked seemingly together, but possibly in a consciously parallel manner, to erect procedural barriers and hurdles to deny Usher his constitutional due process rights to a fair administrative proceeding and to a defense that would be based on that proven exculpatory evidence.

2.     The evidence in question (the "Exculpatory Evidence") consists of the records that the DOJ produced to Usher as discovery in a criminal prosecution that DOJ brought against Usher.  DOJ and OCC worked together in seeking to prosecute Usher, but using the Exculpatory Evidence, Usher was able to mount a successful defense before the jury.

3.     In January 2017, the DOJ Antitrust Division indicted Usher and two others under the Sherman Act, as part of its much ballyhooed foreign exchange (or "FX") criminal antitrust prosecution.  The DOJ Antitrust Division issued a press release to trumpet the accusation against Usher on January 10, 2017, featuring damning quotes from the Deputy Attorney General Sally Yates and from the top antitrust enforcement official Bill Baer, the former head of the Antitrust Division then serving in the Associate Attorney General's office.  *See* Press Release, Dep't of

Justice Antitrust Division, Three Former Traders for Major Banks Indicted in Foreign Currency Exchange Antitrust Conspiracy (Jan. 10, 2017).[1]

4.      Usher—a citizen and resident of England—waived extradition to appear in New York City for a criminal antitrust trial in the Southern District of New York ("SDNY").  Using the Exculpatory Evidence, Usher mounted a powerful and successful defense of his London-based trading conduct in foreign exchange, demonstrating its permissible purposes and general acceptance in Usher's industry.  In October 2018, after a short deliberation, the jury acquitted all three defendants and soundly rejected the government's claims of criminal liability under the antitrust laws.

5.      Other agencies investigated Usher's FX trading conduct and did not find a basis for charges.  The UK's Serious Fraud Office ("SFO") investigated Usher and concluded that no amount of additional investigating would lead to a criminal charge against him.  The UK's Financial Conduct Authority ("FCA") regulates the financial services industry in the UK; its role includes, among other things, ensuring the industry's stability; it took no action against Usher. The Fraud Section of the Criminal Division of the DOJ also investigated Usher and the FX industry and did not indict Usher.

6.      Despite the acquittal on the charges brought by the Antitrust Division, the OCC is persisting in prosecuting an administrative enforcement action against Usher.  The OCC's case arises from an investigation it coordinated with DOJ, and is based on the same foreign exchange conduct:  The administrative law judge in the OCC action has written that "it is beyond dispute that the [OCC's] charges . . . arise from the same alleged course of conduct that formed the basis

_____

[1] https://www.justice.gov/opa/pr/three-former-traders-major-banks-indicted-foreign-currency-exchange-antitrust-conspiracy.

for [Usher's] criminal prosecution by the Antitrust Division." Order on Motion to Dismiss at 50, *In the Matter of Usher*, OCC No. AA-EC-2017-3 (July 28, 2020).

7.      The penalties that the OCC seeks against Usher are severe:  lifetime banishment from the banking industry and a $1.5 million penalty.

8.      The OCC's theory is that Usher's trading caused the distant parent of the bank that employed Usher to plead guilty to a criminal antitrust violation.  The OCC will use the bank's guilty plea to support its case for Usher's liability in the OCC matter.  Usher, of course, has been acquitted of the criminal antitrust charges in his jury trial in the SDNY.  His defense is, in part, that for whatever good faith reasons the bank chose to plead guilty, the government is estopped from claiming it is because Usher's acquitted trading created any criminal antitrust liability.  Moreover, Usher's FX trading was fully within FX trading norms of banks operating in the London FX marketplace, as the Exculpatory Evidence amply demonstrates.

9.      Usher's request is exceedingly modest:  he asks to defend himself, for a second time, in a second, parallel American proceeding, using the same evidence that the U.S. Government has already gathered and produced to him as exculpatory.

10.      As a practical matter, the Exculpatory Evidence is already in Usher's possession. However, he cannot currently access the Exculpatory Evidence under the terms of the protective order entered in his criminal trial.  Therefore, all Usher needs is DOJ's consent for him to "use" that evidence by presenting it to another arm of the same government—i.e., OCC personnel.  All use of the Exculpatory Evidence would be governed by the protective order entered in the OCC matter by an administrative law judge.[2]

---

[2] Usher's OCC proceeding is presided over by Administrative Law Judge Jennifer Whang, of the Office of Financial Institutions Adjudication ("OFIA").

11.     Because the foreign exchange investigation has spawned numerous criminal prosecutions and related civil litigations, there are dozens of legal teams in the United States and Europe that have received all, or substantial portions, of these very same exculpatory materials from the U.S. DOJ and the banks themselves.  Of the numerous legal teams in the world who have a valid need for these materials, only Usher and another OCC defendant have been denied access to them.  The rest have and are using them extensively in trials, depositions, and motion practice.

12.     While Usher's request is modest and imposes no logistical burden on the government at all, the government's response reeks of obstruction and spite arising from its trial loss and a contempt for due process and its *Brady* obligations.  The DOJ Antitrust Division has undertaken a campaign of intransigence and resistance, seeking in essence to bury the Exculpatory Evidence, including the very evidence that embarrassed it at Usher's criminal trial. In order to deny Usher evidence before the OCC, the DOJ Antitrust Division even took the position last year that the trial exhibits from the Antitrust Division's 2018 SDNY antitrust criminal trial were not public documents, and Usher could not use even the SDNY trial exhibits in the OCC proceeding.  After that vindictive strategy failed,[3] the United States Government has employed its limitless resources to undertake a series of additional maneuvers to frustrate Usher's efforts to defend himself using the Exculpatory Evidence.  Taken together, these maneuvers make up the shell game referenced at the top of this Complaint:

---

[3] *United States v. Usher*, No. 17-cr-19, 2021 U.S. Dist. LEXIS 1974 at *3 (S.D.N.Y. Jan. 6, 2021) (ruling that "trial exhibits generally, and certainly including the trial exhibits contested here, are public documents").

(a)     To start with, the OCC denied possession of and responsibility for the Exculpatory Evidence, redirecting Usher to DOJ.

(b)     A simple way to allow Usher to defend himself would have been a minor amendment of the protective order entered in the SDNY criminal case.  But DOJ strenuously opposed such an amendment, arguing that Usher should instead submit to the *Touhy* process.

(c)     Then, when Usher submitted the *Touhy* request that the DOJ Antitrust Division demanded, DOJ denied the request *in its entirety*, citing reasons that lack merit and logic.  *See* Ex. 15, *infra* (Feb. 9, 2021 Letter from Sarah Oldfield) ("The Department denies your request for 'the complete set of documents' produced by the Division to Mr. Usher in criminal discovery.").  DOJ thus refused the release of any of the Exculpatory Evidence.

13.     In the parallel OCC action (which was announced at the same time as the Antitrust Division's indictment in January 2017), the United States Government seeks to deprive Usher of his livelihood and his life savings.  Usher is entitled to due process.  U.S. Const. amend. V.; *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).  That due process includes the right to present all available defenses.  *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932).  It also includes the right to access the exculpatory evidence that the government possesses.  *Sperry & Hutchinson Co. v. FTC*, 256 F. Supp. 136, 142 (S.D.N.Y. 1966).

14.     The Exculpatory Evidence at issue in this action already has been *collected*; it has already been *produced* to Usher; it has already *proven* its capacity to exonerate Usher.  All Usher asks is for one executive agency of the U.S. Government to permit him to present the evidence to another executive agency in its parallel proceeding involving the same conduct.

15.     DOJ's refusal to grant the permission Usher seeks violates both DOJ's own *Touhy* regulations and the Constitution.  Usher therefore asks this Court to require the government to permit Usher to use the Exculpatory Evidence before the OCC.

16.     "An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain:  'The United States wins its point whenever justice is done its citizens in the courts.'"  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The government has lost sight of that guiding principle here.  The fact that one prosecution of Usher has ended in an acquittal is not a license to obstruct justice in a follow-on action.  The Court should require the United States Government to permit justice to be done.

## THE PARTIES

17.     Usher is a lifelong resident and citizen of England.  He resides in the County of Kent, England.  For approximately twenty years, and until the commencement in 2013 of the investigations referred to above, Usher worked in London as a foreign exchange trader.  All of his activities that give rise to the OCC action, as well as the criminal prosecution, occurred in London.

18.     The Department of Justice (also the "DOJ") is an executive department of the United States Government.  28 U.S.C. § 501.

19.     The United States Attorney General is the head of DOJ.  28 U.S.C. § 503.

20.     The Assistant Attorney General for the Antitrust Division of the United States Department of Justice (the "AAG") is an Assistant Attorney General, 28 U.S.C. § 506, supervising DOJ's Antitrust Division (the "Antitrust Division").

21.     Sarah Oldfield, Esq. is a Deputy Chief Legal Advisor in the Antitrust Division.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction under 5 U.S.C. § 702, 28 U.S.C. § 1331, and 28 U.S.C.

§ 1346(a)(2).

23.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1).

## BACKGROUND

### *The London Foreign Exchange Market*

24.     The foreign exchange market is the largest financial market in the world, with a

turnover of trillions of dollars each day.  FX currencies are traded in pairs, with a quantity of one

currency exchanged for a quantity of another currency.  The most heavily traded currency pair in

the world is euros for dollars (EUR/USD).

25.     Foreign exchange transactions take a variety of forms.  "Spot" trades are the

simplest FX transactions.  These transactions settle within two days.

26.     The FX spot market is over-the-counter and decentralized.  This means that there

is no centralized exchange such as the New York Stock Exchange, and the existence of the

market depends on a group of "market-maker" banks, which continually stand ready to buy or

sell currencies.  Market-maker banks provide customers and other counterparties with

"liquidity," i.e., an uninterrupted supply of currency.

27.     FX traders at market-making banks buy or sell currencies to provide their banks

with the inventory of currency that the banks need in order to fill customer orders (or to engage

in trades for the banks' own accounts).  To obtain the currency that banks need to meet

customer/counterparty demand (and supply), traders buy from and sell to other banks and other

counterparties, such as hedge funds.  The aggregate of buyer-seller relationships among the

various market-making banks is called the "interdealer market."

28.     Beginning in 2007 or earlier, it was common for traders, salespersons, brokers, and clients in the FX marketplace to communicate in electronic "chatrooms."  Bloomberg or Reuters typically operated these chatrooms.  The chatrooms could accommodate two or more participants.

29.     Chatrooms among traders featured discussions of market information, known as "market color," which banks encouraged traders to collect.  FX traders who needed to buy or sell currency also used chatrooms to identify counterparties and agree on transactions (that is, a selling bank would seek a buying bank to match off with, or vice versa).  In addition, chatrooms included frequent socializing and humor.

30.     Usher traded spot FX in London.  His employer was JP Morgan (Europe) Ltd, a UK-incorporated entity remotely descended—and separated by numerous intermediary corporations—from JPMorgan Chase, N.A.

31.     During the period 2007-2013, Usher participated in numerous Bloomberg chatrooms.  The DOJ and OCC proceedings discussed in this Complaint focused on his trading and trading-related discussions in one such chatroom.  The three other participants in that chatroom were FX traders affiliated with Citibank, Barclays, and UBS in London or elsewhere in Europe.

### *The Investigations and SDNY Prosecution*

32.     DOJ investigated allegations of misconduct in the FX industry in coordination with other agencies, including the OCC, the Board of Governors of the Federal Reserve System, and the Commodity Futures Trading Commission ("CFTC").  DOJ's Antitrust Division announced an indictment against Usher in the SDNY on January 9, 2017.

33.     DOJ's indictment charged Usher and his codefendants with violating the Sherman Antitrust Act, 15 U.S.C. § 1.  The Indictment alleged that Usher and the other members of the

chatroom at issue conspired to "fix prices," "rig bids," and "eliminate competition" in the worldwide market for euros and dollars.  Ex. 1, at 7 and *passim*.

34.     In the criminal case discovery, based on the U.S. Government's constitutional obligations to Usher, DOJ produced the Exculpatory Evidence.  Those records included mostly documents that DOJ had collected from other parties, but also documents that DOJ had created.

35.     Usher reviewed significant portions of the Exculpatory Evidence to prepare his defense for the antitrust jury trial.  As the trial drew near—and even during the course of the trial—he continued to re-explore, re-review, and re-analyze discovery documents pertinent to DOJ's developing case.

36.     At trial, Usher presented records from the Exculpatory Evidence as a major part of his defense.  These records included trading data, order books reflecting customer orders, additional Bloomberg chats, emails, and other evidence.

37.     Usher used the Exculpatory Evidence at the criminal trial to advance multiple defense purposes, including (but not limited to) the following:

(a)     *Context to trading "episodes."*  DOJ built its prosecution case around a series of trading "episodes."  Each episode was a terse, cryptic chatroom discussion among traders buying and selling currencies.  DOJ interpreted language from each episode as evidence of "collusive" cooperation among competing traders.  At trial, Usher presented exculpatory context to the episodes from various forms of data and communications.  That context demonstrated the permissible purposes that the chatroom chats served, including standard free market buy-sell transactions between banks (known as "matching") that served the interests of each bank and its customers.  Such legitimate buy-sell

coordination is "vertical" buy-sell coordination in the parlance of antitrust law, not "horizontal".

(b)     *Evidence of prevalent industry practices.*  DOJ's indictment alleged that Usher, his codefendants, and a cooperating witness entered into a "conspiracy"—i.e., an agreement—to fix prices, rig bids, and eliminate competition.  According to DOJ, the manifestations of that agreement were certain, specified trading-relating practices.  At trial, Usher presented chatrooms transcripts and other communications from around the FX market showing the relevant trading practices to be prevalent, well-accepted industry trading norms— not the terms of any agreement.  The Exculpatory Evidence demonstrated the legitimate and widely accepted role of market color that served marketplace participants.

38.     In October 2018, after a three-week trial, the jury acquitted the defendants in approximately four hours.

### *The OCC Enforcement Action*

39.     The Office of the Comptroller of the Currency (also the "OCC") is a bureau within the Department of the Treasury.  12 U.S.C. § 1(a).  The OCC supervises national banking associations and other institutions.  12 U.S.C. § 1813(q)(1).  The Comptroller of the Currency (the "Comptroller") is the chief officer of the OCC.  12 U.S.C. § 1(b).

40.     The OCC issued a Notice of Charges for Prohibition and Notice of Assessment of Civil Money Penalty on January 9, 2017, i.e., *the same day* that DOJ announced its indictment. Ex. 2.  Further illustrating the coordination between the OCC and DOJ, both charging documents highlighted the same key currency trades and chatroom conversations allegedly reflecting coordination.

41.     OCC enforcement actions are assigned for merits hearings and pretrial proceedings to the Office of Financial Institution Adjudication (or "OFIA").  An OFIA ALJ entered a stay of the OCC proceedings pending disposition of the criminal case.

42.     Even after the acquittal, the OCC's action remained dormant for more than another year.  The OCC revived the action in late 2019-early 2020.

43.     The OCC's original charging document alleged, in part, a violation of the same statute charged in DOJ's indictment, namely section 1 of the Sherman Antitrust Act.  After motion to dismiss practice, the OCC withdrew the allegation that Usher violated any law.  Ex. 3. The OCC's factual allegations remained unchanged, however.

44.     The OCC's operative charges characterize Usher's conduct as collusive "coordination" with "competitors" (that did not violate antitrust or other laws).  Ex. 3, ¶ 23 and *passim*.

45.     The OCC's operative charges allege that Usher's chatroom conversations constituted "unsafe and unsound" practices.  *Id.* and *passim*.  According to a prior opinion of the Comptroller, an "unsafe and unsound" practice is one that was "contrary to *generally accepted standards of prudent operation*" and generated "abnormal risk or loss or damage"—the so-called "Horne standard."  *In the Matter of Patrick Adams*, No. AA-EC-11-50, 2014 OCC Enf. Dec. LEXIS 278 (OCC Sep. 30, 2014) (quoting Statement of Chairman John E. Horne, 122 Cong. Rec. 26474 (1966)) (emphasis added).[4]

---

[4] The Court of Appeals for the District of Columbia Circuit also requires the agency to prove that the conduct in question "threaten[ed] the financial integrity of the [bank]."  *Dodge v. Comptroller of the Currency*, 744 F.3d 148, 156 (D.C. Cir. 2014) (internal quotations omitted). In the Usher proceeding, the OCC has disavowed having to make this showing.  Order on Motion to Dismiss at 21 n.36, *In the Matter of Usher*, OCC No. AA-EC-2017-3 (July 28, 2020).

46.     The OCC's operative charges allege that Usher acted "recklessly."  Ex. 3, ¶¶ 23, 55(a).  Both the Horne standard and the alleged recklessness make relevant Exculpatory Evidence about the trading practices of other banks, to establish the prevailing practices in London in existence at the time of the events at issue.

47.     The OCC, like DOJ before it, has undertaken to present its case through a series of trading "episodes."  Those episodes (like DOJ's episodes) are short fragments of chatroom conversations.  The episode list that the OCC has provided to date overlaps only in part with the set of episodes addressed at the criminal trial; the OCC has stated that its present intention is to use additional episodes than those the DOJ featured at its trial.

48.     Usher has pleaded a variety of defenses to the charges.  Ex. 4.  One of his affirmative defenses is that he did not receive the "fair notice" that the Constitution requires before a significant administrative penalty may be imposed.  *Id.* at 8-9.

49.     The OFIA ALJ has entered a protective order to govern the OCC proceeding.  Ex. 5.  The OCC Protective Order provides that documents produced in discovery in the OCC proceedings may be used only for purposes of that proceeding, and may be disclosed only to the parties, the administrative law judge, and their agents.  *Id.* ¶ 2 and *passim*.

50.     Discovery in the OCC action is well under way.  Fact depositions begin this month (March 2021) and end on June 1, 2021.  All of discovery is scheduled to conclude on August 12, 2021.  The evidentiary hearing on the merits starts on December 6, 2021.  Usher's counsel estimate that the duration of the hearing will be approximately two weeks.

51.     In meet-and-confer discussions, Usher's counsel informed the OCC of his need to use the Exculpatory Evidence in his defense.  OCC counsel stated that they do not have possession, custody, or control of the evidence collected by DOJ.  OCC counsel also denied that

DOJ had been part of the OCC's "prosecution team."  The OCC reiterated these assertions in discovery-related briefing.  Ex. 6, at 5 & nn.2-3.

52.     The OCC's operative charging document seeks to ban Usher for life from the banking industry and to fine him 1.5 million dollars.  Ex. 3, at 1-2, 21.

### *The SDNY Protective Order*

53.     Discovery in the criminal case was governed by a protective order entered by the Honorable Richard M. Berman, United States District Judge (the "SDNY PO").   Ex. 7.  The SDNY PO permitted Usher and his codefendants to use the DOJ-produced discovery in connection with the criminal case.  *Id.* ¶ 1.

54.     After Usher's acquittal, his attorneys disabled their discovery database, terminating their access to the Exculpatory Evidence.  Usher's counsel refrained from irretrievably destroying the evidence—keeping a dormant, archived copy—in view of its potential importance to any subsequent actions against Usher.

55.     As noted *supra*, the OCC action resumed in late 2019-early 2020.  The OFIA ALJ denied Usher's first motion to dismiss the OCC action on July 28, 2020.

56.     On August 14, 2020, Usher asked Judge Berman to amend the SDNY PO to permit Usher to use the DOJ discovery in the OCC action.  Usher made the request jointly with his SDNY codefendant (and fellow OCC target) Rohan Ramchandani.  Usher and Ramchandani argued that the amendment of the SDNY PO would spare various third parties the burden of producing any documents.  Ex. 8, at 4.

57.     Despite the lapse of nearly two years since the defeat of criminal charges and the manifest absence of additional antitrust prosecutions, DOJ insistently (and vindictively) opposed an amendment of the SDNY PO.  As discussed further *infra*, DOJ asserted that Usher and Ramchandani should seek any DOJ documents they need through the "*Touhy* process."

58.     At a conference held on November 4, 2020, Judge Berman granted Usher and Ramchandani permission to access the previously produced DOJ discovery, on a temporary basis, in order to identify specific records that they wish to use in their respective OCC defenses. Ex. 9, at 27.

59.     On December 18, 2020, Ramchandani compiled a list of 58 documents as to which he sought an amendment of the SDNY PO.  Ex. 10.  Judge Berman denied the request. Ex. 11.  Judge Berman stated, however, that the SDNY PO's obligations would not apply to documents "for which [Ramchandani] has a pending or approved *Touhy* request."  *Id.* at 3.

60.     Usher continues intensive efforts to access and review DOJ's discovery pursuant to the temporary authorization Judge Berman granted at the November 4, 2020 conference. Usher is scheduled to update Judge Berman about his review by March 29, 2021.

61.     In discussions with DOJ, Usher's counsel have promised repeatedly to cooperate with any requests by DOJ for additional protections of the Exculpatory Evidence—on top of those already provided by the OCC Protective Order—such as sealing documents, as needed.

### The Touhy *Process*

62.     In proceedings before Judge Berman, DOJ repeatedly represented that Usher can and should seek access to DOJ documents through the "*Touhy* process":

(a)     In an August 21, 2020 letter, DOJ wrote that Usher "ha[s] an alternative . . . means of discovery" preferable to an amendment of the SDNY PO. Ex. 12, at 5.  DOJ explained:  "With respect to materials created by [DOJ] or other U.S. federal agencies . . . there is an established process for requesting such materials in . . . the *Touhy* process."  *Id.*

(b)      At the November 4, 2020 conference, DOJ stated:  "If Mr. Usher and Mr. Ramchandani wanted to use [certain documents] . . . they would have to file a *Touhy* request."  Ex. 9, at 20.

(c)      In a November 16, 2020 letter, DOJ represented to the court:  "The Government has informed Defense Counsel of the means by which they could seek to use the documents in the OCC proceeding (including through . . . the *Touhy* process)."  Ex. 13, at 2.  DOJ added in its letter to the court:  "If Defense Counsel follow those protocols, *that may resolve all disputes*."  *Id.* (emphasis added).[5]

(d)      Opposing Ramchandani's request to amend the SDNY PO as to 58 documents, DOJ wrote on December 18, 2020 that—instead of the amendment— "Mr. Ramchandani . . . is invited to file a request under 28 C.F.R. §§ 16.21 et seq., commonly known as the *Touhy* regulations, which govern the provision of material in the Department's files."  Ex. 10, at 8.

63.      On January 14, 2021, Usher submitted a comprehensive *Touhy* request by letter to the Assistant Attorney General for the Antitrust Division, Makan Delrahim.  Usher's *Touhy* request sought "the complete set of documents produced by [DOJ] to [Usher] in discovery in . . . the criminal case."  Ex. 14, at 1.

---

[5] DOJ also requested, and Judge Berman so instructed, that Usher petition the ALJ to issue subpoenas to obtain documents.  Usher petitioned the ALJ for subpoenas to recreate the Exculpatory Evidence.  The ALJ ordered Usher to propose subpoenas that covered a smaller set of documents.  While Usher intends to comply with this order, for the reasons set forth in this complaint, Usher requires access to the full suite of Exculpatory Evidence his *Touhy* request covers.

64.     Usher noted in his *Touhy* letter that the documents at issue "are directly relevant to the OCC case and critical to [Usher's] ability to present a defense similarly robust to the one that achieved his criminal case acquittal." Ex. 14, at 1.  Usher explained in general terms the ways in which he intends to use the DOJ discovery in the OCC proceeding. *Id.* at 1-2.  He described the materials included in DOJ's discovery and attached a DOJ-compiled index of the records at issue.  *Id.* at 2 and Exhibit B.[6]

65.     Usher's *Touhy* letter analyzed the reasons why Usher's request was meritorious under DOJ's *Touhy* regulations, specifically including 28 C.F.R. § 16.26.  Ex. 14, at 2.  Usher explained that, as a practical matter, because Usher possesses the documents at issue, granting the *Touhy* request would not require DOJ to make a production or incur other expenses.

66.     On February 9, 2021, Sarah Oldfield, Esq., Deputy Chief Legal Advisor in the Antitrust Division, provided a response by letter on DOJ's behalf.  Ex. 15.  That February 9 letter denied Usher's *Touhy* request in its entirety.  Oldfield asserted that Usher's request was "unduly burdensome" and that Usher had not "provide[d] any justification for his request."  *Id.* at 2.  Oldfield added that any "FBI draft transcripts . . . are likely privileged," and that Usher should obtain "third-party documents . . . directly from those parties."  *Id.*  Oldfield did not specify the "burden" DOJ anticipated.  Oldfield's response did not address Usher's *Brady*-based need for the documents or the fact that the Antitrust Division had previously seen fit to produce these materials as part of its *Brady* disclosures.

---

[6] In an abundance of caution, Usher is redacting DOJ's discovery index, i.e., Exhibit B to Exhibit 14, except for the column headers at the top of the index.  Usher will separately seek leave to file under seal an unredacted version of this document.

*Other Proceedings Relating to the FX Investigation*

67.     The investigation by DOJ, the OCC, and other agencies into banking practices in the FX industry has generated numerous legal proceedings.

68.     DOJ has brought two additional criminal prosecutions arising from the same foreign exchange investigation. *United States v. Johnson et al.*, No. 16-cr-457 (S.D.N.Y.); *United States v. Aiyer et al.*, No. 18-cr-333 (S.D.N.Y.).  Trial has concluded in both matters.

69.     The OCC, the Board of Governors of the Federal Reserve System, and the CFTC have brought enforcement actions against multiple banks as a result of the same FX investigation.

70.     Civil plaintiffs have brought numerous civil suits against numerous banks on the basis of information developed in the government's investigations.  At least nineteen such actions are pending in the Southern District of New York.  *See, e.g.*, *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.).

71.     Civil suits against various banks arising from the government's FX investigations also are pending in other jurisdictions, such as the UK.

72.     These myriad legal proceedings have involved disclosures and discovery, including disclosures and discovery of records overlapping with the Exculpatory Evidence at issue here.

## COUNT ONE:  UNLAWFUL DENIAL OF USHER'S REQUEST FOR THE EXCULPATORY EVIDENCE

73.     This Count incorporates by reference the preceding paragraphs of this Complaint.

74.     Usher is being prosecuted for the second time by an executive agency of the United States Government, after being once acquitted by a jury.  The OCC's action arises from

the same set of facts prosecuted by DOJ.  The OCC's action revolves around significantly overlapping legal and factual issues.  The OCC's action threatens severe penalties against Usher.

75.    Usher needs the Exculpatory Evidence in order to properly defend himself in the OCC's action.  The Exculpatory Evidence would serve at least the following purposes:

(a)    Providing exculpatory context to the OCC's hand-picked trading episodes, by showing from surrounding evidence that Usher's conduct in those episodes was not "collusive" with other banks, and instead served Usher's bank's own lawful interests.

(b)    Challenging the OCC's allegation that certain alleged behaviors were the terms of an "agreement," and showing those behaviors instead to be prevalent market practices and norms.  *See Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) (where "[a]n essential element of the . . . case required [proof that the defendant] conspired with [others]," evidence properly showed that the conduct in question "occurred due to independent action motivated by . . . industry practice").

(c)    Challenging the OCC's allegation that the foreign exchange practices at issue were contrary to "generally accepted standards," and showing instead that those practices were commonly treated in the industry as prudent— i.e., consistent with the Horne standard.  *See In the Matter of Faigin*, No. FDIC-11-269e, 2015 OFIA LEXIS 4, at *213 (FDIC Aug. 21, 2015) (failure to conduct

a certain financial analysis was not unsafe or unsound "in the absence of evidence

showing that [the analysis] was a standard industry practice").[7]

       (d)    Challenging the OCC's allegation that Usher's conduct imposed

any actionable "abnormal risk" on JPMorgan.  Only a "reasonably foreseeable"

risk can support an enforcement action.  *Kaplan v. United States Office of Thrift*

*Supervision*, 104 F.3d 417, 421 (D.C. Cir. 1997).  The foreseeability of the risk

that a bank will incur penalties for certain conduct dramatically decreases where

the conduct was prevalent in the industry.

       (e)    Challenging the OCC's allegation that Usher acted "recklessly" in

adopting certain practices common in his industry.  *See Mfrs. Hanover Tr. Co. v.*

*Drysdale Sec. Corp.*, 801 F.2d 13, 24 (2d Cir. 1986) ("overall standards of

industry practice" can suffice to "negate [a] claim of . . . recklessness").

       (f)    Supporting Usher's affirmative defense that he did not receive the

"fair notice" that the Constitution requires in order for a significant administrative

penalty to be permissible.  *See Ohio Cast Prods. v. OSHRC*, 246 F.3d 791, 799

(6th Cir. 2001) ("Factors that the court[s] weigh[] in evaluating adequate notice

include . . . common understanding and commercial practice.").

76.    The U.S. Government's own *Justice Manual* recognizes the importance of the

Exculpatory Evidence and of access to this evidence in a timely manner:

> Government disclosure of material exculpatory and impeachment
> evidence is part of the constitutional guarantee to a fair trial. . . .  [A] fair
> trial will often include examination of relevant exculpatory or
> impeachment information that is significantly probative of the issues

---

[7] Enforcement actions of the OCC and the Federal Deposit Insurance Corporation are
governed by the same statute, 12 U.S.C. § 1818.

> before the court but that may not, on its own, result in an acquittal . . . .
> Due process requires that disclosure of exculpatory and impeachment
> evidence material to guilt or innocence *be made in sufficient time to permit
> the defendant to make effective use of that information at trial. . . .*
> Exculpatory information must be disclosed *reasonably promptly after it is
> discovered.*

U.S. Department of Justice, *Justice Manual* § 9-5.001 (2020) (emphasis added).[8]

77.     Usher's Touhy request was meritorious under DOJ's own *Touhy* regulations, 28

C.F.R. §§ 16.21-16.29, because, among other reasons:

(a)     Usher identified with particularity the records he was requesting,

namely the Exculpatory Evidence, by referencing and attaching DOJ's own index

of those records.

(b)     The Exculpatory Evidence is relevant to the OCC proceeding for at

least the reasons described *supra* ¶ 75.

(c)     The disclosure Usher requested is appropriate under the rules of

procedure applicable to the OCC proceeding.

(d)     The requested disclosure is appropriate under the law of privilege.

Indeed, any privilege that may have attached to records included in the

Exculpatory Evidence dissolved when DOJ produced those records to Usher and

his codefendants for use at a public trial.

(e)     The disclosure would violate no statute, rule of procedure, or

regulation.

---

[8] https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.001.

(f)     The disclosure would reveal no classified information, confidential source, confidential information, or investigatory records compiled for law enforcement purposes.  All of the records at issue *have already been revealed* to Usher and his codefendants.  All of the records are already in Usher's custody, but to date Usher lacks the authority to use them in the OCC proceeding.  Most if not all of the records at issue have been disclosed to numerous other litigants in other dockets.  And Usher seeks only to disclose the Exculpatory Evidence to the United States Government itself—i.e., the OCC prosecutors and administrative law judge—subject to the OCC Protective Order, as well as other protections, should DOJ request them.

(g)     The disclosure would not interfere with enforcement proceedings or impair the effectiveness of investigative techniques and procedures.  The statute of limitations has run on any antitrust violation relating to the records at issue.

(h)     The disclosure would not improperly reveal trade secrets.

78.    DOJ's denial of Usher's *Touhy* request through Oldfield's letter was a final agency action.

79.    DOJ's explanations for its denial of Usher's *Touhy* request lack merit and logic, because, among other reasons:

(a)     The request is not at all "burdensome."  The disclosure Usher requests involves no burden to DOJ at all.  The disclosure involves only materials already disclosed to Usher.  DOJ is not being asked to gather any additional evidence.  DOJ will not need to conduct any search or review any documents.  It

will not need to produce a single document.  Usher asks only for DOJ to consent to Usher's use of the Exculpatory Evidence in his custody before another forum of the United States Government.  At issue is only Usher's timely authorization to access the information already in his custody.

(b)     Usher's *Touhy* letter demonstrated the relevance of the Exculpatory Evidence to the OCC proceeding.  *Compare* 28 C.F.R. § 16.22(d) ("[T]he responsible U.S. Attorney shall *request a summary of* the information sought and its relevance to the proceeding" (emphasis added)), *with* Ex. 15 (Oldfield's letter, incorrectly characterizing § 16.22(d) and even-less-pertinent regulations as requiring "particularity").

(c)     Any transcripts and "draft transcripts" referenced in Oldfield's letter, Ex. 15, at 2, are not privileged.  Indeed, no records remain privileged after being produced—as the Exculpatory Evidence was—to litigation adversaries for use in a public trial.

(d)     There is no legal barrier that prevents DOJ from disclosing—or, in this case, granting consent for Usher to use—records that various entities copied and produced to DOJ during DOJ's investigation.  DOJ trial counsel has asserted that certain files are the property of DOJ or third parties.  *E.g.*, Ex. 9, at 20.  That assertion is incorrect:  records produced in discovery are not the "property" of any party or entity in any legal sense.  All producing third parties provided DOJ with the at-issue records prior to the entry of any protective order, knowing that the records would be used in DOJ's investigation, and knowing that the records would be produced to Usher and his codefendants for use in a public trial.

80.    DOJ's *Touhy* restrictions on disclosure of evidence are not even applicable, or should not be applicable, because *the United States*, through the OCC, is a *party* to the OCC proceeding against Usher.

81.    Usher is entitled to due process in the OCC enforcement action, because that action adjudicates important rights.  U.S. Const. amend. V.; *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).  That due process includes the right to present all available defenses.  *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932).  It also includes the right to exculpatory evidence that the government possesses.  *Sperry & Hutchinson Co. v. FTC*, 256 F. Supp. 136, 142 (S.D.N.Y. 1966).[9]

82.    Typically, the constitutional right to exculpatory evidence "is triggered by the *potential impact* of favorable but undisclosed evidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (emphasis added).  Here there is no need to hazard a prediction on the Exculpatory Evidence's potential impact:  The SDNY criminal trial has already established the Exculpatory Evidence's capacity to exonerate Usher.

83.    DOJ's denial of Usher's *Touhy* request was arbitrary, capricious, an abuse of discretion, not in accordance with law, and contrary to Usher's constitutional rights.

---

[9] The court in *Sperry*, 256 F. Supp. at 142, wrote:  "[D]ue process requires the prosecution in a criminal case to disclose evidence in its possession which may be helpful to the accused.  Presumably, the essentials of due process at the administrative level require similar disclosures."  *See also EEOC v. Los Alamos Constructors, Inc.*, 382 F. Supp. 1373, 1383 n.5 (D.N.M. 1974) ("*Brady* . . . orders that exculpatory information must be furnished a defendant in a criminal case.  A defendant in a civil case brought by the government should be afforded no less due process of law."); *United States v. Edwards*, 777 F. Supp. 2d 985, 997 (E.D.N.C. 2011) (cases holding "that *Brady* does not apply to certain civil cases . . . involved merely money or damage to reputation"); *Landry v. FDIC*, 204 F.3d 1125, 1137 (2000) (analyzing the FDIC's compliance with *Brady* and *Jencks*, and finding a *Jencks* violation).

84.     Declaratory and injunctive relief to remedy DOJ's denial of Usher's *Touhy* request would be directed appropriately to all or some of the following defendants:  DOJ, the Attorney General (as head of DOJ), the AAG (as supervisor of the Antitrust Division), and Oldfield (as the official responsible for DOJ's denial letter).  5 U.S.C. § 702.

## PRAYER FOR RELIEF

For the foregoing reasons, Usher asks the Court to enter an order or orders:

(a)     Declaring that Usher's January 14, 2021 *Touhy* request is meritorious;

(b)     Declaring that Usher's constitutional rights entitle him to use the Exculpatory Evidence in his defense in the OCC proceeding;

(c)     Requiring DOJ, the Attorney General, the AAG, and Oldfield to comply with Usher's January 14, 2021 *Touhy* request forthwith; and

(d)     Granting any other relief as the Court may deem appropriate, including attorney's fees and costs.


Respectfully submitted,

Richard Usher

By his counsel,

/s/ J. Mark Gidley
J. Mark Gidley (Bar No. 417280)
White & Case LLP
701 13th Street N.W.
Washington, DC 20005
(202) 626-3609
mgidley@whitecase.com

Michael Kendall
Samuel R. Feldman
Alexandra I. Gliga
White & Case LLP
75 State Street
Boston, MA 02109
(617) 979-3310
michael.kendall@whitecase.com
samuel.feldman@whitecase.com
alexandra.gliga@whitecase.com

**Certificate of Service**

I, J. Mark Gidley, hereby certify that on March 15, 2021, I caused the foregoing

Amended Complaint to be served on all defendants named in the original Complaint, by having a

copy of the Amended Complaint mailed to:

THE UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

THE UNITED STATES ATTORNEY GENERAL
The United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

THE ASSISTANT ATTORNEY GENERAL FOR THE ANTITRUST DIVISION OF THE
UNITED STATES DEPARTMENT OF JUSTICE
The United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

SARAH OLDFIELD
The United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

THE OFFICE OF THE COMPTROLLER OF THE CURRENCY
400 7th Street, S.W.
Washington, D.C. 20219

THE COMPTROLLER OF THE CURRENCY
The Office of the Comptroller of the Currency
400 7th Street, S.W.
Washington, D.C. 20219

/s/ J. Mark Gidley
J. Mark Gidley (Bar No. 417280)
White & Case LLP
701 13th Street N.W.
Washington, DC 20005
(202) 626-3609
mgidley@whitecase.com